# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**John J. Grant,**
**Petitioner Below, Petitioner**

**FILED**

September 21, 2015
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

**vs)  No. 15-0003** (Berkeley County 11-C-909)

**Patrick Mirandy, Warden,**
**St. Mary's Correctional Center,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner John J. Grant, by counsel Ben J. Crawley-Woods, appeals the Circuit Court of Berkeley County's December 1, 2014, order denying his petition for writ of habeas corpus. Respondent Patrick Mirandy, Warden, by counsel Christopher C. Quasebarth, filed a response. Petitioner filed a reply. On appeal, petitioner alleges that the circuit court erred in denying his habeas petition because he established that he was entitled to relief based upon newly discovered evidence and the State's suppression of exculpatory evidence.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2006, petitioner was indicted on one count of first-degree murder for the shooting death of Donald Redman. Following trial, the jury convicted petitioner of the lesser included offense of second-degree murder. Thereafter, in March of 2008, the circuit court sentenced petitioner to a term of incarceration of forty years. Petitioner then appealed his conviction to this Court, which refused the same by order entered on October 29, 2009.

In October of 2011, petitioner filed a *pro se* petition for writ of habeas corpus. After counsel was appointed, petitioner filed a second amended petition alleging the following grounds for relief: 1) newly discovered evidence in the form of post-conviction affidavits from his co-defendant and a witness at trial; 2) the State's knowing presentation of false testimony; 3) ineffective assistance of counsel; 4) sufficiency of the evidence; and 5) admission of letters petitioner wrote while awaiting trial. Petitioner later supplemented this petition with an additional affidavit. The circuit court then held an omnibus evidentiary hearing, after which it denied petitioner habeas relief. It is from this order that petitioner appeals.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the

1

following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal to this Court, petitioner reasserts his claims that the circuit court erred in denying him a new trial based on newly discovered evidence and the State's failure to provide him with exculpatory evidence. The Court, however, does not agree. Upon our review and consideration of the circuit court's order, the parties' arguments, and the record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on these alleged errors, which were also argued below. Indeed, the circuit court's order includes well-reasoned findings and conclusions as to the assignments of error raised on appeal. Given our conclusion that the circuit court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the circuit court's findings and conclusions as they relate to petitioner's assignments of error raised herein and direct the Clerk to attach a copy of the circuit court's December 1, 2014, "Final Order Denying Petition For Habeas Corpus" to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** September 21, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

IN THE CIRCUIT COURT OF BERKELEY COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel.
JOHN J. GRANT,

Petitioner,

v.

Case No.: 11-C-909
(Judge Silver)

PATRICK MIRANDY, Warden,
Saint Mary's Correctional Center

Respondent.

## FINAL ORDER DENYING PETITION FOR HABEAS CORPUS

On a previous day came the Petitioner, by counsel, Ben Crawley-Woods, and the

Respondent, by counsel, Christopher C. Quasebarth, Chief Deputy Prosecuting

Attorney, pursuant to an agreed schedule ordered by the Court. Upon mature

consideration of the testimony, pleadings, record, and the record of the underlying

criminal trial, State v. John J. Grant aka Butter, Case No.: 06-F-277, the Court denies the

relief requested in the Petition for Writ of Habeas Corpus.

### A. FINDINGS OF FACT.

*The Criminal Case, Case No.: 06-F-277.*

1. On October 27, 2005, law enforcement officers responded to 517 North Third

Street, Martinsburg, on a report of a possible homicide. Upon arrival, officers

discovered the body of Donald "Dee" Redman, dead from gunshot to the head.

1

Investigation led to identifying the Petitioner as the person who shot Mr. Redman in retaliation for a drug money dispute. [Criminal Complaint.]

2. The Petitioner was subsequently indicted for Murder for the shooting death of Mr. Redman. [Indictment, 10/25/06, State v. John J. Grant aka Butter, Case No.: 06-F-277.]

3. The State filed a notice to use *W.V.R.E.* 404(b) evidence to show absence of mistake and plan or, alternatively, as statements against interest. The statements were contained in a series of letters written by the Petitioner to Shacole Rolle, outlining his requests to harm witnesses, bribe witnesses, falsify testimony, or force witnesses not to appear. Some of the letters were found abandoned at Rolle's foster family's home and others were subsequently turned over to the State by Rolle. [Notice of Intent to Use 404(b), or Motion to Use Letter as Statement Against Interest, 8/1/07.]

4. After a McGinnis hearing on the 404(b) motion, in which Det. Swartwood and Ms. Rolle testified about the letters, the trial court ruled that the evidence that the Petitioner requested Rolle to contact witnesses for the purposes of having the witnesses either change their testimony or to intimidate the witnesses was admissible under *W.V.R.E.* 404(b) and not unfairly prejudicial. The trial court also ruled that the letters are statements against interest. The letters' probative value was not significantly outweighed by the danger of unfair prejudice. Moreover, the Petitioner had no right to

2

object to the seizure of the letters abandoned by Ms. Rolle. [Order Regarding Admissibility of Letters and Denial of Bifurcation, 11/7/07.]

5. At trial, the State called the following witnesses: Sgt. Shannon Armel of the Martinsburg Police Department; Senior Trooper Harlan Heil of the West Virginia State Police; Wayne Derflinger; Deandre "Dollar" Fullen; Leroy "Peanut" Newell, Jr.; Sgt. Synder of the Berkeley County Sherriff's Department; Dr. Hamada Mahmoud, Deputy Chief Medical Examiner; Priscilla Cordell Anderson; Shacole Rolle; and Lt. Detective George Swartwood of the Martinsburg Police Department.

6. Sgt. Armel testified that he received a call from dispatch about a possible homicide at a duplex located at 515 and 517 North Third Street in the City of Martinsburg. [Tr. 11/27/07, Vol. 2, 6.] After finding the front door unsecure, Armel directed Corporal Phelps and Patrolman Darby to enter via the front door as he went around to the side and proceeded to the rear of the building. [Id., 7.] Upon reaching the back of the duplex, Armel observed an enclosed porch and a black male on his back, motionless. [Id.] The man was later identified as Donald "Dee" Redman; an EKG was performed to verify his death. [Id., 9.] Armel testified to securing the scene and searching for and collecting evidence. [Id., 9-10.] Armel testified that it was apparent that Redman's body had been dragged from a side door at 517, the home of Derflinger, around the back and into the open porch of an unoccupied residence of 515 North Third

3

Street. [Id. 10, 13, 19.] While outside the residence, Armel collected a bloody rag and t-shirt near the body. [Id., 16.] Armel then explained that the side door, where the body had been dragged, at 517 opened into a kitchen. [Id., 32, 34.] Blood spots were found in the kitchen area as well as a mop bucket with some kind of cleaning solution, where it appeared to Armel that someone attempted to clean up the kitchen. [Id., 33.] Adjacent to the kitchen was a small room identified as a pantry or laundry room where a washer and dryer were located. [Id., 34, 35.] Armel testified that three spots of blood were found in this room. [Id., 35.] A plastic toy handgun was found lying on the ground in front of the washer and dryer. [Id., 36-37.] Armel testified that he could not locate any classifiable prints, other than a few smudges, off of the toy gun. [Id., 40.] The pantry/laundry room floor had a pull-out door leading to the basement. [Id., 36.]

7. On cross-examination, Armel testified that the bloody t-shirt, sweat pants, and rag at the crime scene were field tested for blood with positive results; however, they were not submitted to the Crime Lab for further testing. [Id., 45.] Armel also testified that little blood was found at the crime scene, and that the vast majority of blood was around the wound, nose, and mouth of the victim. [Id. 46, 47.]

8. Trooper Heil testified that he and Tpr. Harmon assisted the Martinsburg City Police Department in the collection of evidence. [Id., 65-72.] Heil authenticated a not-to-scale diagram prepared by Harmon. [Id.] Heil then used this diagram to show the jury

4

where blood was found on the side door of the kitchen, on the kitchen floor, on the door frame to the laundry room, and on the laundry room floor. [Id., 76.] Heil testified that all evidence collected was turned over to the Martinsburg Police Department. [Id., 77-78.]

9. Wayne "Dougie" Derflinger testified that he lived at 517 North Third Street. [Id., 79-80.] Derflinger testified that he had been twice convicted for battery and once for assault on a police officer. [Id., 80.] Derflinger testified that he had been a drug addict for about ten years, he permitted people to use drugs at his residence, and people were at his residence at 517 North Third Street using drugs on October 27, 2005. [Id., 81.] Derflinger testified that on the night in question there were people, "[i]n and out," including the Petitioner, Prince, Dollar, and T-Dot. Derflinger did not know their real names but knew they were from New York. They were at the residence on the night of October 26 and the morning of October 27, using and selling crack cocaine. [Id., 81-82.] Derflinger testified that Peanut, Ann, and Ashley were at his home during the same time. [Id., 83.] Donald "Dee" Redman came to the home during that time with, "Ann, Peanut, and them." [Id., 84.] Derflinger testified that he let Redman in through a door and Redman went straight to the pantry with Ann and Peanut. [Id., 84-85.] Derflinger testified that Redman was there to get some drugs. [Id., 85.] Upon hearing Redman in the pantry, Derflinger testified that Prince and the Petitioner came from the bedroom,

through the living room and kitchen and into the pantry. [Id. 90.] At this point, Derflinger was standing between the kitchen and living room and could hear Prince and Redman arguing about money. [Id. 92-93.] Derflinger testified that Prince gave the Petitioner a gun, the Petitioner then stuck it to Redman's head and shot him. [Id., 94-95.] The Petitioner took Redman out of the home through the side door. [Id. 95.] After the Petitioner came back into the house, Prince warned everyone, "[h]e said if anybody say anything, turn anything in, people get the same thing he just got." [Id., 96.] Derflinger then told everyone to leave his house. [Id., 96.] Priscilla had been sitting at the table in the dining room when the argument was going on and Dee was shot. [Id., 97.] Derflinger testified that he panicked and started cleaning up the blood with a rag and then threw the rag down into the basement. [Id., 98.] Derflinger then left the residence with Peanut and Redman's girlfriend and went to Capital Heights, but no one informed Redman's girlfriend that Redman was shot and killed. [Id., 99.] Derflinger testified that he later came back to the residence and around 5:00 a.m., then walked to his mother's, who took him to the police station to report what had happened. [Id., 100.]

10. On cross-examination, Derflinger admitted giving two videotaped statements to Det. Swartwood, one at approximately 8:37 a.m., and the second around 1:15p.m. [Id., 102.] Derflinger admitted that he told Swartwood that the shooting occurred around 4:30 a.m., and in his first statement he didn't know who let Redman in the

6

house that night. [Id., 104, 107.] Derflinger testified that he told Swartwood that he was sleeping in the recliner when Redman came into the residence and that he was asleep when he heard the shot being fired. [Id., 115.] Derflinger testified that he was shook up over the shooting and that he had been smoking crack for five to six days straight prior to giving his statements to Swartwood. [Id., 102, 111.] Derflinger testified that he cleaned up a puddle of blood approximately five inches in diameter. [Id., 126.] Derflinger testified that he didn't tell Swartwood about cleaning up with a rag and disposing of it in the basement because he panicked. [Id., 123.]

11. On redirect, Derflinger testified that he was absolutely positive that the Petitioner shot Redman, and he was absolutely positive that he saw the gun in the Petitioner's hand. [Id., 139-140.]

12. Deandre Fullen testified that he, Priscilla, Prince, and the Petitioner traveled from New York City by bus and were [in Martinsburg] during the week of the October 21-27, 2005. [Tr. 11/28/07, Vol. 1, 16.] Fullen testified that he did not know their real names but they were from the same area. [Id., 17.] Fullen admitted to being at Derflinger's house from the late evening of October 26 into the 27th. [Id., 19.] Fullen testified that he was using weed and drinking all day. [Id.] Fullen testified that he, Prince, the Petitioner and T-Dot went to the house together and did not leave. [Id., 20.] Fullen stated that people came by that he didn't know, but Redman showed up. [Id.]

7

Fullen testified that he was in the living room, heard a knock on the door and then Redman came in. [Id., 22.] Fullen testified that he next heard a shot, turned around and Redman's body was on the floor. [Id.] He saw only Prince, the Petitioner and Redman in the kitchen laundry room area. [Id.] Fullen was sitting in front of the living room and observed a couple of guns. [Id.] Fullen testified that he saw Prince pick up a gun but was unsure if it was a fake. [Id., 22-23.] Fullen observed that after the shot the Petitioner had a gun and put it in his waist. [Id. 23.] Fullen saw the Petitioner and Prince drag Redman out the doorway in the kitchen to the back. [Id. 24.] Fullen did not actually see the shot fired, just that the Petitioner had the gun. [Id., 28.] There were three or four people still at the house. [Id., 23.] Fullen, Priscilla and Prince left, caught a ride to Martin's grocery store then walked home. [Id.] Although he didn't speak to the Petitioner, Fullen testified that he heard the Petitioner say, "I shouldn't have did it." [Id., 25.] Fullen testified that the next day Priscilla gave them a ride to Washington, D.C., to catch a bus. [Id.] After arriving in New York there was no discussion of the crime. [Id.] Fullen testified this is because they have a saying, "Don't snitch, don't snitch, don't snitch." [Id.] Fullen testified that he has no had contact with them since. [Id.] Fullen testified that he was originally charged with aiding and abetting murder, but that he pleaded to accessory after the fact. [Id., 26, 41.] Fullen testified that he did not know about the shooting before it was going to happen. [Id., 27.] Fullen testified

8

that he completed his year in jail and voluntarily came back from New York to testify after being subpoenaed. [Id. 27-28.] Fullen admitted to having a conviction for marijuana. [Id. 27.]

13. On cross-examination, Fullen testified that he was arrested in Pennsylvania on the aiding and abetting charges because he left New York after finding out that he was wanted in West Virginia. [Id., 38.] Fullen admitted to entering into a plea agreement with West Virginia to a misdemeanor for his truthful testimony. [Id., 40-44.] Fullen admitted to smoking weed the night in question, and was high at the time of the shooting. [Id., 61.] Fullen testified that it was late and he was asleep, heard a shot and woke up. [Id., 62.] Fullen testified that he observed Prince cleaning a gun at Priscilla's. [Id.] Fullen testified that he was around when Prince told Priscilla to throw away the gun. [Id.]

14. On redirect, Fullen testified that he knows the Petitioner and refers to him as "Butter." [Id. 67-68.]

15. Leroy "Peanut" Newell, Jr., admitted to being addicted to drugs for over twenty years, and his drug of choice is cocaine. [Id., 75.] Newell admitted that he has a lengthy criminal history, including about 10 different shoplifting charges, distribution of crack or cocaine, false information, failure to appear, obstruction, destruction of property, probation violation, and an unlawful wounding. [Id., 75-76.] Newell testified

that he used drugs with Redman, Derflinger, and Priscilla Cordell. [Id., 77.] Newell testified that he was at Derflinger's house during the evening hours of October 26 to the early morning of October 27, 2005. [Id., 78.] Newell testified that he came there to purchase crack from a man that he knew only as "Prince", who he thought was from New York. [Id., 79-80.] Newell stated that a man he thought was Prince's brother was there, named "Butter", and identified him as the Petitioner. [Id., 79-80.] Newell testified that Dollar, Ashley, and another female were at the residence. [Id., 81.] Newell knew Redman from the two living together, and testified that he heard a knock and saw Redman coming in the back door. [Id., 82.] Upon seeing Redman, Newell called for him to come over to him in the laundry/pantry room whereupon they proceeded to get high. [Id., 83-84.] Newell testified that Ashley left, then Prince and the Petitioner came in the laundry/pantry room and an argument broke out between Prince and Redman. [Id., 84.] Newell testified that the Petitioner pulled a gun out, placed in it Redman's face, they continued to argue, and then the gun goes off. [Id.] Newell testified that he left the laundry/pantry room but observed the Petitioner and Prince drag Redman's body out the back door. [Id., 85.] When they came back in Prince approached Newell and said, "Don't forget I know about your Mom and your little man." [Id.] Newell testified that he never saw Redman with a gun or show a gun. [Id.] Newell did see a fake gun lying on the floor after they dragged Redman's body out of the laundry/pantry room. [Id.]

10

Newell could not say where the fake gun came from. [Id., 86.] The only person with a gun that Newell saw was the Petitioner, it was a revolver with a black barrel and brown handle. [Id.] Newell testified that Derflinger helped clean up the "mess." [Id., 87.] Newell testified that he left the residence and did not speak to the police at first for fear of being in trouble. [Id. 89.] Newell then arranged to speak with Det. Swartwood and was advised of his *Miranda* rights, after which he gave a videotaped statement. [Id., 89.] Newell testified that he was not facing Redman when the shot went off because he was trying to keep people out of the laundry/pantry room. [Id., 90.] Newell stated that Dollar was in the living room at the time of the shooting. [Id., 91.]

16. On cross-examination, Newell testified that he was currently at the Huttonsville Correctional Center waiting on parole papers. [Id., 92.] Newell testified that he was outside the laundry/pantry room but still had his hand on the door. [Id., 96.] Newell testified that he did not actually see the Petitioner shoot Redman but he did see him with the gun. [Id., 100.] Newell testified that he did not speak to Derflinger before speaking to the police later that evening. [Id., 103-104.]

17. On redirect, Newell testified that he saw the Petitioner first point the real gun at Redman's chin, then pointed at his head. [Id., 108-109.]

18. Deputy Theodore Snyder testified that Priscilla Cordell was cooperating with the police [about drugs] prior to October 30, 2005, and he was the contact officer. [Id.,

11

126.] Snyder testified that Cordell contacted him about clothing in her washing machine. [Id., 129.] These items were collected and turned over to Det. Swartwood. [Id.]

19. On cross-examination, Snyder testified that Cordell was the target of a narcotics investigation. [Id., 131.]

20. On redirect, Snyder testified that Cordell's plea agreement to the narcotics investigation required her to testify in all inquires, state, federal, and grand jury, but that she was not given immunity. [Id., 132-133.]

21. The State then read to the jury the parties' stipulation that the decedent in this matter is Donald Redman. [Stipulation No. 1, 11/29/07.]

22. The parties stipulated that Dr. Mahmoud, State Deputy Chief Medical Examiner, is an expert in forensic pathology. [Tr. 11/28/07, Vol. 2, 7.] Mahmoud testified that he performed the autopsy on Redman and that the cause of death was a single gunshot into the left temple area. [Id.] The bullet entered the left temple and passed from left to right and was slightly forward and upward without exiting. [Id.] Mahmoud noted that there were no other significant injuries. [Id.] Mahmoud testified that there would not have been a significant amount of bleeding. [Id., 9.] Mahmoud testified that the barrel was placed against the skin when the bullet was fired. [Id., 9-10.] Mahmoud testified that cocaine and alcohol were present in Redman's system at his time of death. [Id., 11.]

12

23. On cross-examination, Mahmoud testified that the cocaine in Redman's system was taken shortly before his death. [Id., 11.]

24. Priscilla Cordell Anderson testified that her name is Priscilla Anderson and used to be known as Priscilla Cordell. [Id., 12.] Priscilla testified that she was a drug addict for eight years and this is how she had met Prince. [Id., 13-14.] Priscilla and Prince soon formed a relationship whereby he would take care of her financially. [Id., 15.] They started living together in August or September, along with Priscilla's three children. [Id.] Prince left to go back to New York and returned with the Petitioner, who she identified as "Butter". [Id., 16.] She testified that she did not know Prince's real name but had heard him referred to as Curt "The Flirt." [Id., 16.] She testified that expenses were shared between the three and funded by selling dope. [Id., 17.] Individuals by the names of Dollar, T-Dot, and Ty came to reside with them. [Id., 17-18.] She testified that they sold crack at Derflinger's house. [Id., 18.] She testified that she was at the house on October 26 and 27, 2005. [Id., 19.] She and T-Dot went to Derflinger's house that evening to sell crack; Prince, Dollar, and the Petitioner were already there as well as other people, some that she did not know. [Id.] She was at Derflinger's when Redman came over. [Id., 20.] She testified that Redman came in and went to the laundry/pantry room. [Id.] Prince and Dollar then went to the laundry/pantry room where Redman and Newell where located. [Id., 20-21.] She

testified that Derflinger was around that area, along with Dollar. [Id., 21.] She then heard a loud boom and heard Redman's body hit the ground. [Id., 23.] She testified that Prince had a gun when he went into the laundry/pantry room. [Id., 24.] She testified that she did not see the shooting. [Id., 24.] When Prince came back in he told Derflinger to, "clean up the mess" and "nobody says anything. Nobody saw anything. We're going to be back." [Id., 25.] She testified that she then left with the Petitioner, Prince, T-Dot, Dollar and Ty to go back to her house. [Id.] She testified that the Petitioner said to Prince that he didn't know why he [Prince] was stressing out because he [the Petitioner] was the one that shot Redman. [Id. 27.] She testified that someone asked, "Do you have Dee's gun? Did you take—did you get Dee's gun when we took him outside." [Id.] To this Prince laughed and said, "No, it was a fake." [Id.] The Petitioner then said, "That's why we should—that, that's why I shot him." [Id.] She testified that she then drove Prince, the Petitioner, T-Dot, Dollar and Ty to the bus station in Washington, D.C. so they could go back to New York. [Id. 28.] She testified that Prince left her some drugs to sell and the gun for her to throw away, which she did in a stream. [Id., 29.] She testified that she talked to Det. Swartwood and did not tell the truth because she was scared of getting in trouble and because of what happened to Redman. [Id., 29-30.] She was subsequently caught by Swartwood selling the drugs Prince left for her. [Id. 30-31.] She testified that she figured that the police had wired her phone and knew she had spoken

14

to Prince, so she had better tell some of the truth. [Id., 30-31.] However, she did not tell Swartwood about the gun until the preliminary hearing in this case. [Id., 31.] She testified that she has drug distribution charges pending in federal court and her cooperation would not gain her favor in her sentencing. [Id. 31-32.] Her agreement was that the State would not bring charges against her concerning this homicide for her cooperation. [Id., 31-32.] She admitted having a prior conviction for Possession with Intent to Distribute heroin in 2001. [Id., 33.] She testified that she was telling the truth today. [Id.]

25. On cross examination, Anderson testified that she had been smoking for several days before the homicide. [Id., 40.] She admitted to not telling Det. Swartwood about the gun and disposing of it. [Id., 41.] She clarified that she gave a dishonest statement voluntarily to Swartwood before she was arrested in a sting operation the day after the homicide; thereupon, she gave another statement that was truthful except her omission about disposing of the gun. [Id., 43.] She testified that there was a rift between Redman and Prince over drugs and this caused excitement when Redman arrived at Derflinger's that night. [Id., 52-55.]

26. On redirect, Anderson testified that Prince was the voice of the group and the Petitioner did whatever Prince told him. [Id., 60-61.]

15

27. Shacole Rolle testified that she and the Petitioner were friends and that she visited him in a local facility. [Id., 75.] The Petitioner wrote her letters that she intended to keep private. [Id., 75-76.] [At this time the trial court gave the jury a cautionary instruction regarding letters written by the Petitioner and sent to Rolle. [Id., 77.]] Rolle identified some letters that she received from the Petitioner, signed "A. Butta" and that she knew that to be John Grant, the Petitioner. [Id., 78.] Rolle was questioned about the contents of the letters and testified that she was upset that the letters were found and did not want to read them in court. [Id., 83-85.]

28. Det. Doyle testified that Priscilla Anderson was cooperative in identifying the suspects during the investigation. [Id., 99-101.]

29. Det. Swartwood testified that he was the lead investigator and ultimately responsible for safe keeping the evidence. [Id., 104-105.] Swartwood testified that he and the other officers felt like there was no need to send any evidence to the crime lab for further testing because the evidence was obvious. [Id., 105.] Swartwood testified that he received information that Shacole Rolle visited the Petitioner in jail and, upon finding an address for Rolle, he found that Rolle no longer resided at this address. [Id., 108.] The letters Rolle testified about were turned over by Rolle's foster mother. [Id., 109.] The letters were sent from the Eastern Regional Jail, addressed to Rolle, and bear the name "Butta" or "John Grant." [Id., 111.] Swartwood then read State's Exhibit

16

Number Ten, dated 10/06: "Everybody else is waiting for a miracle to happen instead of doing something...Hear this. Priscilla and Dougie, I want them missing. You just can't talk to them and believe they word. I want them in a coma. They can't make it to court, you dig." [Id., 112.] The letter then listed addresses and phone numbers for Derflinger and Anderson. [Id., 112-113.] Swartwood then read State's Exhibit Number Seven, dated 2/4/07: "Now this other mother fucker. His girl in here with me. I want you to try to reach out to her so she can tell her man not to do this crazy shit to me. Y'all tell her we got a certain amount of money for them...tell him to change his statement....Just basically, those two don't come or change their statement, Peanut, a/k/a Leroy Lee Newell Jr. I'm good. Home free..." [Id., 114-115.] He then read State's Exhibit Number Eight, dated 2/6/07: "Now Dougie, I want him touched...And Peanut, have that girl to see him. See what he he's talking about. Tell her to tell him we've got money for him to change his statement...Now Priscilla. I want her ass touched also." [Id., 116-117.] Swartwood then read State's Exhibit Number Nine, dated 3/1/07: "I just need to stop Dougie and see Peanut. Somebody has to talk to him. Tell his girl to talk to him as well. Tell my brother to tell both of them he got a certain amount of money for both of them. Tell how to tell him, just change his statement. I'm good. And when he do it, he would get the rest of the money when I'm free." [Id., 119-121.]

17

30. On cross-examination, Swartwood testified that he had not performed a handwriting analysis on the letters. [Id., 126.]

31. The State rested.

32. The Petitioner moved the Court for a judgment of acquittal. [Tr. (11/29/07, Vol. 1, Pg. 6-31.)

33. The trial court denied the Petitioner's motion, finding that, in the light most favorable to the State, a *prima facie* case was established to each and every element of First Degree Murder. [Id., 31.]

34. The trial court then conducted a *Neuman* dialogue with the Petitioner. The Petitioner answered that he understood his right and did not wish to testify. [Id., 35-35.]

35. The defense rested without any witnesses renewed the motion for acquittal, which was again denied. [Id., 37-38.]

36. Jury instructions were argued, including the Petitioner's request for the lesser-included offenses of Murder in the Second Degree, Voluntary Manslaughter, and Involuntary Manslaughter. The trial court granted the Petitioner's request for each of those lesser-included instructions. [Id., 43-68.]

37. The jury was instructed, deliberated and returned a finding of guilt of the lesser-included offense of Murder in the Second Degree. [Id., 75-93, 149, 164; Verdict Form, 11/29/07.]

18

38. The Court sentenced the Petitioner to the statutory sentence of forty (40) years for the conviction of Murder in the Second Degree. [Sentencing Order, 3/18/08.] [1]

39. The Petitioner was again sentenced for appeal purposes. [Agreed Order Resentencing Defendant, 9/16/08.]

*The Direct Appeal.*

40. The Supreme Court of Appeals of West Virginia refused the Petitioner's direct appeal. [Order, 10/29/09, Docket No.: 091236.]

*The Petition for Writ of Habeas Corpus, Case 11-C-909.*

41. The Petitioner filed a *pro se* habeas petition. [Petition, 10/9/11.]

42. The Petitioner's counsel filed a verified Second Amended Petition for Writ of Habeas Corpus and *Losh* list. The Petitioner alleged: 1) Newly Discovered Evidence, in the form of post-conviction affidavits dated from 2009 from his co-defendant and from Mr. Newell. The Pearsall affidavit asserted that the Petitioner had nothing to do with nothing. The Newell affidavit did not address the substance of any testimony or evidence, but asserted that Newell testified at trial because the police said they may charge him as an accessory and that he may be paroled to Berkeley County; 2) The State's Knowing Presentation of False Testimony by Mr. Newell; 3) Ineffective

---

1. The Court notes that the Petitioner's co-defendant, Kurtis Pearsall, pleaded guilty to Murder in the Second Degree for his role in Mr. Redman's murder. The Court sentenced Mr. Pearsall to the statutory determinate sentence of twenty years pursuant to a plea agreement. [State v. Kurtis M. Pearsall aka Prince; Case No.: 08-F-99.]

19

Assistance Of Counsel, for including Lesser-included Offenses in the jury instructions; 4) Sufficiency of the Evidence; and 5) Admission of Letters the Petitioner Wrote while Awaiting Trial. [Second Amended Petition for Writ of Habeas Corpus,10/23/13.] [2]

43. The Court directed the Respondent to file its response. [Order, 12/11/13.]

44. The Respondent filed its Return, Motion to Dismiss, and supporting Memorandum. [Respondent's Return, Motion to Dismiss, and Memorandum, 3/4/14.]

45. The Petitioner filed a Supplement to the Second Amended Petition, adding an amended 2014 affidavit from Mr. Pearsall. [Supplement, 6/10/14.]

46. The Respondent filed a response to the Supplement. [Response, 7/14/14.]

47. The Petitioner filed a reply. [Reply, 7/21/14.]

48. The Court conducted an evidentiary hearing, during which the Petitioner was present, on the only issue that the Petitioner requested evidence to be taken on, receiving testimony from Leroy "Peanut" Newell. Mr. Newell testified that he is the same Newell that testified at trial, but that he remembers very little of his trial testimony. Mr. Newell asserted his right against self-incrimination as to most of the questions asked of him regarding his statements to the police during their investigation

---

2. The Petitioner was separately convicted by plea, and sentenced, for one felony count of Retaliation Against a Witness and two misdemeanor counts of Intimidation of a Witness, from a separate Indictment charging criminal retaliation and intimidation of the murder trial witnesses Anderson, Fullen, Derflinger and Newell. [State v. Grant; Case No.: 07-F-180.] The Petitioner never appealed from that conviction or sentence, and it is not the subject of any allegation in this habeas corpus proceeding.

of the Petitioner, but acknowledged that he was not asked to falsify his trial testimony by the Prosecuting Attorney. The Court ordered the parties to file proposed orders. [Order, 9/19/14.]

49. The Petitioner filed his proposed Final Order. [Petitioner's Proposed Order, 10/16/14.]

50. The Respondent filed his proposed Final Order. [Respondent's Proposed Order, 11/17/14.]

## B. CONCLUSIONS OF LAW.

A habeas corpus procedure is "civil in character and shall under no circumstances be regarded as criminal proceedings or a criminal case." State ex rel. Harrison v. Coiner, 154 W.Va. 467, 176 S.E.2d 677 (1970); **W. Va. Code** § 53-4A-1(a).

A convicted criminal has the right to one omnibus post-conviction habeas proceeding. The Supreme Court of Appeals of West Virginia holds:

> In general, the post-conviction habeas corpus statute...contemplates that every person convicted of a crime shall have a fair trial in the circuit court, an opportunity to apply for an appeal to this Court, and *one omnibus post-conviction hearing* at which he may raise any collateral issues which have not previously been fully and fairly litigated.

Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606, 609 (1981)(emphasis added).

"A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed. Syl. Pt.

21

4, State ex rel. McMannis v. Mohn, 163 W.Va. 129, 254 S.E.2d 805 (1979), *cert. den.,* 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 112 (1983)." Syl. Pt. 9, State ex rel. Azeez v. Mangum, 195 W. Va. 163, 465 S.E.2d 163 (1995); Syl. Pt., State ex rel. Phillips v. Legursky, 187 W. Va. 607, 420 S.E.2d 743 (1992).

"There is a strong presumption in favor of the regularity of court proceedings and the burden is on the person who alleges irregularity to show affirmatively that such irregularity existed." Syl. Pt. 2, State ex rel. Scott v. Boles, 150 W. Va. 453, 147 S.E.2d 486 (1966); State ex rel. Massey v. Boles, 149 W. Va. 292, 140 S.E.2d 608 (1965); Syl. Pt. 1, State ex rel. Ashworth v. Boles, 148 W. Va. 13, 132 S.E.2d 634 (1963).

Due to this strong presumption of regularity, statutory law requires that a petition for writ of habeas corpus ad subjiciendum shall "specifically set forth the contention or contentions and grounds in fact or law in support thereof upon which the petition is based[.]" **W. Va. Code** § 53-4A-2. The reviewing court shall refuse, by written order, to grant a writ of habeas corpus if the petition, along with the record from the proceeding resulting in the conviction and the record from any proceeding wherein the petitioner sought relief from the conviction show that the petitioner is entitled to no relief or that the contentions have been previously adjudicated or waived. **W. Va. Code** § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, 215 W.Va. 729, 601 S.E.2d 49, 54 (2004); Perdue v. Coiner, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979).

22

In order to prevail on an issue previously adjudicated during the criminal proceeding, the petitioner must prove that the trial court's ruling is "clearly wrong". W. Va. Code § 53-4A-1(b). Grounds not raised by a petitioner in his petition are waived. Losh v. McKenzie, 166 W. Va. 762, 277 S.E.2d 606, 612 (1981); *see also*: State ex rel. Farmer v. Trent, 206 W. Va. 231, 523 S.E.2d 547 (1999), at 550, n. 9. Any ground that a habeas petitioner could have raised on direct appeal, but did not, is presumed waived. Syl. Pts. 1 & 2, Ford v. Coiner, 156 W. Va. 362, 196 S.E.2d 91 (1972).

The reviewing court has a mandatory statutory duty to enter an order denying the relief requested in a habeas petition if the record demonstrates that a habeas petitioner is entitled to no relief. That statute reads, in part:

> If the petition, affidavits, exhibits, records and other documentary evidence attached thereto, or the return or other pleadings, or the record in the proceedings which resulted in the conviction and sentence, or the record or records in a proceeding or proceedings and a prior petition or petitions filed under the provisions of this article, or the record or records in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, show to the satisfaction of the court that the petitioner is entitled to no relief, or that the contention or contentions and grounds (in fact or law) advanced have been previously and finally adjudicated or waived, the court shall enter an order denying the relief sought.

W. Va. Code § 53-4A-7(a); *see also* **W. Va. Code** § 53-4A-3(a) and Perdue v. Coiner, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979). Furthermore, **W. Va. Code** § 53-4A-1, *et*

*seq.,* "contemplates the exercise of discretion by the court", authorizing even the denial of a writ without hearing or the appointment of counsel. Perdue v. Coiner, *supra.*

When denying or granting relief in a habeas corpus proceeding, the court must make specific findings of fact and conclusions of law relating to each contention raised by the petitioner. State ex rel. Watson v. Hill, 200 W. Va. 201, 488 S.E.2d 476 (1997).

1. **The Petitioner is not entitled to relief on his allegations of Newly Discovered Evidence.**

The standard for a "newly discovered evidence" claim is:

> " 'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his [or her] affidavit that [the defendant] was diligent in ascertaining and securing [the] evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. Syl. pt. 1, *Halstead v. Horton,* 38 W.Va. 727, 18 S.E. 953 (1894).' Syllabus, *State v. Frazier,* 162 W.Va. 935, 253 S.E.2d 534 (1979)." Syllabus point 3, *In re Renewed Investigation of State Police Crime Laboratory, Serology Division,* 219 W.Va. 408, 633 S.E.2d 762 (2006).

Syl. Pt. 4, State ex rel. Smith v. McBride, 224 W.Va. 196, 681 S.E.2d 81 (2009).

24

The Petitioner fails to prove that he meets this standard with his assertions regarding the two affidavits from his co-defendant, Kurtis Pearsall, and the affidavit and testimony from witness Leroy "Peanut" Newell.

The trial evidence from several witnesses, as noted above, makes plain the following. The Petitioner was seen to shoot Redman and kill him, or was pointing a gun at Redman's head when the gun went off, in October 2005. This shooting took place during an argument between Redman with the Petitioner and Pearsall, while they were in a small pantry together in Derflinger's house. The Petitioner and Pearsall then disposed of Redman's body by dragging it out of the house and leaving it on the porch next door. Pearsall then returned to Derflinger's house and threatened the witnesses. The Petitioner made statements admitting to the shooting. Pearsall and the Petitioner fled the jurisdiction together. The Petitioner, once captured, began instructing Rolle to get to the witnesses and bribe them or threaten them to change their stories.

*The Pearsall Affidavits.*

Pearsall was apprehended in 2008, almost three years after Redman's killing. Pearsall pleaded guilty in November 2008 to Murder in the Second Degree for his role in that murder. [State v. Pearsall, Case No.: 08-F-99.] Neither his 2009 nor 2014 affidavits offer any new evidence probative of the Petitioner's murder conviction.

25

Pearsall's 2009 affidavit claims that the Petitioner "had nothing to do with what went down that night." Pearsall's 2014 affidavit contradicts his 2009 affidavit by admitting that the Petitioner was present at the killing, but then asserting that Pearsall (not the Petitioner) killed Redman. Neither affidavit overcomes the trial testimony of Derflinger, Fullen, Newell and Anderson, each of whom testified that they were present at the scene when the Petitioner murdered Redman, and each of whom testified to the actions of the Petitioner and Pearsall before, during and after the murder.

This court also compares Pearsall's affidavits to his own statement to presiding Berkeley County Circuit Judge Wilkes, written after Pearsall was apprehended and was awaiting arraignment on the murder charge:

> Now I know that I had nothing to do with whatever these people are talking about. First off, I'm not that type of person. Now, if you ask me what I was doing out in Martinsburg I would tell you that I was taking care of my family. I'm an up and coming song writer. I was working a little job so that I could pay for my studio time. I know I was not involved in any such thing. I have no idea why I am accused of this. I don't even know what is going on.

[Letter to Judge Wilkes, 8/14/08, State v. Pearsall, Case No.: 08-F-99.] The record shows that, despite knowing nothing about the matter in August 2008, just three months later, on November 20, 2008, Pearsall pleaded guilty to Redman's murder.

The Petitioner fails the first two prongs of McBride. The Pearsall affidavit "evidence" is not proven to have been discovered since the Petitioner's 2007 trial, or

that any diligence was exercised in securing it. The Pearsall assertions are information known to both the Petitioner and Pearsall from the moment that Redman was shot and killed four years earlier since both were present together at the scene. The trial testimony, and Pearsall's admissions, place the two of them together with Redman at the time of Redman's killing. Trial testimony also places Pearsall and the Petitioner leaving the murder scene together in October 2005, to be driven together to Washington, D.C., to catch a bus together to New York. This court also takes judicial notice that the record from Pearsall's case, Case No.: 08-F-99, shows that Pearsall was incarcerated in Martinsburg, West Virginia, when he was arraigned on September 19, 2008. *W.V.R.E.* 201; Arnold Agency v. West Virginia Lottery Com'n, 206 W.Va. 583, 526 S.E.2d 814 (1999). West Virginia Department of Corrections records show that Pearsall has been imprisoned on the murder sentence in Case No.: 08-F-99 since November 2008. Yet, nearly four years pass before the 2009 Pearsall affidavit.

The Petitioner fails to prove the third and fourth prongs of McBride. There is nothing "new and material" in the affidavit assertions. Compared to the rest of the trial evidence, they are not such as would produce an opposite result at a second trial. The Petitioner and Pearsall were both convicted of Murder in the Second Degree for their respective roles in killing Redman. Principals in the second degree are just as culpable, and face the same punishments, as principals in the first degree, **W. Va. Code** § 61-11-6.

27

As to Pearsall's affidavit, the Petitioner fails to carry his burden that it constitutes newly discovered evidence under State ex rel. Smith v. McBride, *supra*.

*The 2009 Notarized Letter and 2014 Testimony from Leroy "Peanut" Newell.*

As referenced above, Newell testified at the Petitioner's trial. [Tr. 11/28/07, Vol. 1, 75-109.] Newell testified that he witnessed Pearsall and the Petitioner get into an argument with Redman. [Id.] Newell testified that the Petitioner pulled a gun out, placed in it Redman's face, they continued to argue, and then the gun goes off. [Id.] Newell testified that he observed the Petitioner and Prince drag Redman's body out the back door. [Id.] Newell testified that when they came back in, Prince approached Newell and said, "Don't forget I know about your Mom and your little man." [Id.] Newell testified about his own lengthy criminal history and his fear of speaking to the police about the murder he witnessed. [Id.]

Newell witnessed the Petitioner shoot and kill Redman. The Petitioner's co-defendant, Pearsall, threatened Newell immediately following Newell witnessing the murder of Redman. [3] For actions separate from Pearsall's threats, the Petitioner subsequently pled to and was convicted of intimidating Newell, a witness against him, while the Petitioner's murder trial was pending.

---

3.    Derflinger also testified that after removing Redman's body, Prince warned everyone present, "[h]e said if anybody say anything, turn anything in, people get the same thing he just got." [Tr. 11/27/07, Vol. 2, 96.]

28

Just as with the Pearsall affidavit, the Petitioner fails the first two prongs of McBride as to Newell's letter or habeas testimony. Newell did not contradict his own trial testimony, or that of any other trial witness. Newell's trial testimony was consistent with the trial testimony of other witnesses present at the scene. The Petitioner does not prove that Mr. Newell had any new information discovered since the Petitioner's 2007 trial, or that he exercised any diligence in securing it in the time since, even while Newell was incarcerated in the State of West Virginia.

Newell testified at the habeas hearing that he does not recall his trial testimony from seven years earlier. However, the trial evidence from he and other witnesses squarely placed Newell in the small pantry room with the Petitioner, Pearsall and Redman at the time Redman was shot and killed. The trial testimony also showed Newell's criminal background and his reluctance to cooperate with the police for fear that he may be in trouble. From Newell's exercise of his right against self-incrimination *at the habeas hearing,* the court does not draw any adverse inference that Newell testified falsely *at the Petitioner's trial.* Rather, the court finds that Newell's habeas testimony, and his demeanor during that testimony, show a fear of further incriminating himself in the Redman murder and/or a continuing fear of the Petitioner's earlier threats.

The Petitioner fails to prove the third and fourth prongs of McBride. There is nothing "new and material" in Newell's affidavit or testimony. Since Newell offered

nothing to contradict any prior evidence, there is no evidence shown to suggest that an opposite result would occur at a second trial.

The Petitioner also fails to prove the fifth prong of McBride. The 2009 Newell letter and Newell's 2014 habeas testimony, viewed in their best possible light, provide only some doubtful impeachment material. Impeachment is a use specifically prohibited by McBride, *supra*.

As to Newell's affidavit and habeas testimony, the Petitioner fails to carry his burden that it constitutes newly discovered evidence under State ex rel. Smith v. McBride, *supra*. The record plainly demonstrates that the Petitioner is entitled to no relief on his claims about Pearsall or Newell. **W. Va. Code § 53-4A-3(a), -7(a)**; State ex rel. Markley v. Coleman, *supra*; Perdue v. Coiner, *supra*. The claim is denied.

2.  **The Petitioner is not entitled to relief on any allegation of the State Knowingly Presenting False Testimony or Withholding Exculpatory Evidence.**

In order to proven a knowingly presenting false evidence claim, the Petitioner would have to prove:

> In order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict.

Syl. Pt. 2, State ex rel. Franklin v. McBride, 226 W.Va. 375, 701 S.E.2d 97 (2009).

30

The Petitioner withdrew his claim of the State knowingly presenting false testimony in his proposed final order. This withdrawal was based on the habeas hearing testimony of Newell that the Prosecuting Attorney did not ask him to testify falsely. Accordingly, this claim is denied.

The Petitioner's claim of the State withholding exculpatory evidence is likewise denied. This claim is based solely upon the affidavit and habeas testimony of Newell, which was addressed above in the denial of the "newly discovered evidence" claim. For similar reasons, the Petitioner fails to prove a due process violation on his allegation of the State failing to disclose exculpatory evidence.

The standard required to substantiate this claim is:

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

Syl. Pt. 2, State v. Youngblood, 221 W. Va. 20, 650 S.E.2d 119 (2007).

As explained above, Newell provided no evidence in his 2009 letter or his 2014 habeas testimony that contradicted either his trial testimony or the trial testimony of

31

any other witness. Consequently, the Petitioner fails to meet any of the three required prongs of Youngblood.

The Petitioner's claim is based solely on a speculative inference that since Newell invoked his right against self-incrimination during his habeas testimony, he must have testified falsely at trial. The court declined that inference above, and declines it again here against the background of the entire record that shows that: 1) Newell's trial testimony was consistent with that of other trial witnesses; 2) Newell was threatened by Pearsall at the time of the crime; 3) the Petitioner was convicted of trying to intimidate Newell while trial was pending; and 4) at the habeas hearing, Newell may have feared incriminating himself in the murder and/or continues to fear the Petitioner's threats.

The record plainly demonstrates that the Petitioner is entitled to no relief on this claim. **W. Va. Code** § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, *supra*; Perdue v. Coiner, *supra*. The claim is denied.

### 3. The Petitioner is not entitled to relief on any allegation of Ineffective Assistance of Counsel.

The Supreme Court of Appeals of West Virginia holds the following standards necessary to prove ineffective assistance claims:

32

1. "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syllabus Point 5, State v. Miller, 194 W.Va. 3, 459 S.E.2d 114 (1995).

2. "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syllabus Point 6, State v. Miller, 194 W.Va. 3, 459 S.E.2d 114 (1995).

3. "Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syllabus Point 21, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

4. "One who charges on appeal that his trial counsel was ineffective and that such resulted in his conviction, must prove the allegation by a preponderance of the evidence." Syllabus Point 22, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

Syl. Pts. 1-4, State ex rel. Kitchen v. Painter, 226 W.Va. 278, 700 S.E.2d 489 (2010).

None of the Petitioner's assertions meet the necessary standards cited in Kitchen.

The calculated strategy of his defense counsel to request the trial court to instruct the jury on the lesser-included offenses of Murder in the Second Degree, Voluntary Manslaughter, and Involuntary Manslaughter are deemed effective assistance. Syl. Pt. 3, *id*. Based on the trial evidence in the record, had the trial court instructed the jury only as to the elements of Murder in the First Degree, the Petitioner likely would have been convicted of that offense and would now be serving a life sentence instead of the forty year sentence he received.

The Petitioner offered no testimony to support his assertion that trial counsel never *talked* to him about the lesser-included instructions. However, the record plainly demonstrates that the defense request for the lesser-included instructions was thoroughly discussed, and granted, in the Petitioner's presence in open court during the trial proceedings. [Tr. 11/29/07, Vol. 1, 43-68.] The jury was instructed in the Petitioner's presence. [Id., 75-93.] The record demonstrates that the Petitioner offered no objections to his counsel's request. [R., *passim*.]

The record plainly demonstrates that the Petitioner is entitled to no relief on any claim of ineffectiveness of trial counsel. **W. Va. Code** § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, *supra*; Perdue v. Coiner, *supra*. The claim is denied.

4. **The Petitioner is not entitled to relief on any allegation from his direct appeal from conviction and sentence.**

These claims are denied as waived. The Petitioner offered no factual or legal basis for the claims, except to state that that he is "incorporating" his prior direct appeal

34

and then attached it as Exhibit H to the Second Amended Petition. That appeal was refused by the Supreme Court of Appeals by Order entered October 29, 2009. "A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed. Syl. Pt. 4, State ex rel. McMannis v. Mohn, 163 W.Va. 129, 254 S.E.2d 805 (1979), *cert. den.*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 112 (1983)." State ex rel. Azeez v. Mangum, *supra*, 195 W. Va. 163, 465 S.E.2d 163 (1995); Syl. Pt., State ex rel. Phillips v. Legursky, *supra*, 187 W. Va. 607, 420 S.E.2d 743 (1992). The Petitioner's failure to allege a constitutional violation for these claims precludes this court from reviewing the claims.

"[T]he burden is on the person who alleges irregularity to show affirmatively that such irregularity existed." Syl. Pt. 2, State ex rel. Scott v. Boles, *supra*, 150 W. Va. 453, 147 S.E.2d 486 (1966); State ex rel. Massey v. Boles, *supra*, 149 W. Va. 292, 140 S.E.2d 608 (1965); Syl. Pt. 1, State ex rel. Ashworth v. Boles, *supra*, 148 W. Va. 13, 132 S.E.2d 634 (1963). The Petitioner failed to meet his burden of proving irregularity by failing to allege a factual or legal basis in habeas corpus for these grounds. Specificity is required. **W. Va. Code** § 53-4A-2.

The two claims were as to the sufficiency of the evidence to support the conviction and the admission of the letters the Petitioner wrote to Ms. Rolle. These were issues previously adjudicated during the criminal trial, for which the Petitioner must prove that the trial court's ruling were "clearly wrong." **W. Va. Code** § 53-4A-1(b).

35

Even if not waived, the trial record shows that the substantial evidence of the Petitioner's guilt placed before the jury proves that the Petitioner could not meet the high standard of attacking the sufficiency of the evidence required by Syllabus Point 3, State v. Guthrie, 194 W. Va. 657, 461 S.E2d 163 (1995).

Even if not waived, the trial record shows that the trial court did not abuse its discretion in admitting the letters that the Petitioner wrote to Ms. Rolle about intimidating the trial witnesses. A pre-trial W. V. R. E. 404(b) hearing was held in compliance with State v. McGinnis, 193 W. Va. 147, 455 S.E.2d 516 (1994), with the requisite findings made.

The Petitioner failed to prove he was entitled to any relief on these claims. W. Va. Code § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, supra, 215 W.Va. 729, 601 S.E.2d 49, 54 (2004); Perdue v. Coiner, supra, 156 W.Va. 467, 469-470, 194 S.E.2d 657, 659 (1979). They are denied.

### 5. No Cumulative Error Where The Petitioner Proves No Single Error.

The cumulative error doctrine does not apply where no error is shown. State v. Knuckles, 196 W.Va. 416, 473 S.E.2d 131 (1996). The Petitioner fails to prove any alleged error. The record plainly demonstrates that the Petitioner is entitled to no relief on any claim of cumulative error. W. Va. Code § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, supra; Perdue v. Coiner, supra. The claim is denied.

36

6. **The Petitioner is not entitled to relief on any allegation expressly waived.**

The Petitioner expressly waived on his filed, signed and verified <u>Losh</u> list the following grounds: 1-10, 12-15, 18-20, 22-39, 43, 46-47, 49-53. [Losh List.] <u>Losh v. McKenzie</u>, *supra*. The record is plain that the Petitioner is not entitled to any relief on the above expressly waived grounds. **W. Va. Code** § 53-4A-3(a), -7(a); <u>Perdue v. Coiner</u>, *supra*. They are denied.

7. **The Petitioner is not entitled to any other ground not waived for which he provided no factual or legal basis.**

The Petitioner offers no basis for these grounds unwaived on his <u>Losh</u> list:

11-Denial of Counsel;

16-Suppression of helpful evidence by prosecutor;

40-Claims concerning use of informers to convict;

41-Constitutional errors in evidentiary rulings;

42-Instructions to the jury;

43-Claims of prejudicial statements by trial judge;

44-Claims of prejudicial comments by prosecutor; and

48-Improper communications between prosecutor or witness and jury.

Specificity in habeas pleading is required. **W. Va. Code** § 53-4A-2. "'A mere recitation of any of our enumerated grounds without detailed factual support does not justify the issuance of a writ, the appointment of counsel, and the holding of a hearing.' *Losh* [v. McKenzie, *supra*]." <u>SER Markley v. Coleman</u>, *supra*. The record is plain that the

37

Petitioner is not entitled to any relief on the above unsupported grounds. **W. Va. Code** §

53-4A-3(a), -7(a); Perdue v. Coiner, *supra.* They are denied.

8. **The Petitioner is not entitled to relief on any pro se allegation.**

The Petitioner was appointed counsel to file an amended habeas petition.

Counsel filed a Second Amended Petition. Included as Exhibit C to that Second

Amended Petition is a document not signed by anyone or verified, but referenced as the

Petitioner's *pro se* Petition. This Court will not consider those *pro se* allegations.

Syl. Pts. 1 and 2, Losh v. McKenzie, 166 W. Va. 762, 277 S.E.2d 606 (1981), hold:

> 1. An omnibus habeas corpus hearing as
> contemplated in W.Va.Code, 53-4A-1 et seq. (1967) occurs
> when: (1) an applicant for habeas corpus *is represented by*
> *counsel or appears pro se having knowingly and intelligently*
> *waived his right to counsel;* (2) the trial court inquires into all
> the standard grounds for habeas corpus relief; (3) a knowing
> and intelligent waiver of those grounds not asserted is made
> by the applicant upon advice of counsel unless he
> knowingly and intelligently waived his right to counsel; and,
> (4) the trial court drafts a comprehensive order including the
> findings on the merits of the issues addressed and a notation
> that the defendant was advised concerning his obligation to
> raise all grounds for post-conviction relief in one proceeding.

> 2. A judgment denying relief in post-conviction habeas
> corpus is res judicata on questions of fact or law which have
> been fully and finally litigated and decided, and as to issues
> which with reasonable diligence should have been known
> but were not raised, and this occurs where there has been an
> omnibus habeas corpus hearing *at which the applicant for*
> *habeas corpus was represented by counsel or appeared pro se*
> *having knowingly and intelligently waived his right to counsel.*

*Id.* (emphasis added).

38

Accordingly, a post-conviction habeas corpus Petitioner may either proceed by counsel *or*, upon a knowing and intelligent waiver of counsel, may proceed *pro se*. There is no hybrid or middle ground allowed by the Supreme Court for a habeas petitioner to be represented by counsel and proceed *pro se* in the same proceeding.

Accordingly, the record plainly demonstrates that the Petitioner is entitled to no relief on any allegation in his *pro se* Petition, attached as Exhibit C to the Second Amended Petition, which was not raised in the Second Amended Petition. W. Va. Code § 53-4A-3(a), -7(a); State ex rel. Markley v. Coleman, *supra*; Perdue v. Coiner, *supra*.

**Relief Denied.**

For the foregoing reasons, the Second Amended Petition for Writ of Habeas Corpus, and its supplements and addendums, is DENIED.

The Clerk shall enter this Order as of the date noted below and shall transmit attested copies to: counsel of record.

ENTERED: 11/26/14

HONORABLE GRAY SILVER III
CIRCUIT JUDGE

Prepared by:

Christopher C. Quasebarth
Chief Deputy Prosecuting Attorney
State Bar No.: 4676
380 W. South Street, Ste. 1100
Martinsburg, West Virginia 25401
304-264-1971

**The Clerk shall retire this matter from the active docket and place it among cases ended.**

A TRUE COPY
ATTEST
Virginia M. Sine
Clerk Circuit Court
By:
Deputy Clerk

39

The Clerk shall enter the foregoing ORDER as of and for the day and date first hereinabove written and shall transmit attested copies to all counsel of record and to the Petitioner at his last known address.

_____
Honorable Judge Gray Silver, III
23rd Judicial Circuit
Berkeley County, West Virginia

Order Prepared By:

_____
Nicholas Forrest Colvin, Esq.
Counsel to Petitioner

AGREED:

_____
Christopher C. Quesebarth
Chief Deputy Prosecuting Attorney

A TRUE COPY
ATTEST
Virginia M. Sine
Clerk Circuit Court

By: _____
Deputy Clerk